Filed 3/28/24  Robinson v. Stryker Corp. CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| JOSHUA ROBINSON,<br><br>    Plaintiff and Appellant,<br><br>v.<br><br>STRYKER CORPORATION,<br><br>    Defendant and Respondent. | H050336<br>(Santa Clara County<br>Super. Ct. No. 20CV366898) |

Appellant Joshua Robinson filed this action on June 1, 2020, under the Private Attorneys General Act (PAGA; Lab. Code, § 2698 et seq.) against respondent Stryker Corporation (Stryker), a medical technology company.[1]  Robinson alleged that Stryker had committed various Labor Code wage and hours violations.  He alleged that he was bringing the action "on behalf of himself and other current and former aggrieved employees of [Stryker] for penalties."

Stryker moved for summary judgment on the grounds, inter alia, that Robinson lacked standing because he was not a Stryker employee.  Rather, Stryker contended, Robinson was an employee of Pomeroy Technologies, LLC (Pomeroy), which supplied its employees to provide on-site information technology (IT) services to Stryker at its

---

[1] Robinson also sued Stryker Sales Corporation and Howmedica Osteonics Corp. (Howmedica).  The record reflects that on November 5, 2020, Robinson dismissed Stryker Sales Corporation and Howmedica from the action.

various business locations.[2]  Robinson opposed the motion.  In a detailed order filed July 6, 2022, the court granted the motion for summary judgment.  The trial court found that Stryker had met its initial burden of negating an essential element of the complaint by establishing that it had not employed Robinson, and that Robinson had failed to raise a triable issue of material fact establishing such employment.  Because the court concluded that Pomeroy, not Stryker, was Robinson's sole employer, and since only an aggrieved employee has standing to assert a PAGA claim (see *Kim v. Reins International California, Inc.* (2020) 9 Cal.5th 73, 81 (*Kim*)), it granted Stryker's motion for summary judgment.  Judgment was entered in favor of Stryker on August 8, 2022.

On appeal, Robinson asserts that he raised triable issues of material fact in his opposition as to whether he was a Stryker employee under the legal theory that Stryker, along with Pomeroy, was a joint employer.  Based upon our de novo review of the motion for summary judgment, we find no error.  We will therefore affirm the judgment.

## I.  PROCEDURAL BACKGROUND

### A.  Pleadings

On June 1, 2020, Robinson filed this action against Stryker, alleging that he had been "employed by [Stryker] within the statutory time period."  He pleaded one cause of action for civil penalties under PAGA, claiming that Stryker had committed various wage and hours violations of the Labor Code.  Robinson claimed that Stryker had "(1) fail[ed] to pay all meal period wages and rest break wages, (2) fail[ed] to properly calculate and pay all minimum and overtime wages, (3) fail[ed] to provide accurate wage statements, (4) fail[ed] to pay all wages due and owing during employment and upon termination of employment, and (5) fail[ed] to reimburse all necessary business expenses."  Robinson alleged that he was bringing suit "on behalf of himself and other current and former aggrieved employees of [Stryker]."

---

[2] The record reflects that in July 2018, Getronics acquired Pomeroy by merger. We will refer to the entity that provided on-site IT services to Stryker as Pomeroy.

2

Stryker filed an answer to the complaint. Among other affirmative defenses, Stryker alleged that Robinson's claim was barred "because there was no employment relationship with [Stryker]."

**B.  Stryker's Summary Judgment Motion**

In March 2022, Stryker filed a motion for summary judgment. Stryker's essential argument was that Robinson was at all relevant times employed by Pomeroy, not by Stryker. Rather, Stryker outsourced its IT work to Pomeroy, and Pomeroy supplied *its* IT employees to Stryker. Indeed, after leaving Pomeroy's employment, Robinson himself confirmed that his employer had been Pomeroy.

In support of its position, Stryker relied substantially on a July 13, 2017 Master Services Agreement (MSA or Services Agreement) between Pomeroy, as Contractor, and Stryker, as Client. Under that Services Agreement, the parties agreed, inter alia, that (a) Pomeroy would provide IT support to Stryker; (b) Pomeroy would "be the employer in law and in fact of all persons assigned to [Stryker] perform the Services"; (c) Pomeroy would supervise all Pomeroy IT personnel assigned to Stryker, and Pomeroy "[had] the sole right to direct and control the management of such staff"; (d) Pomeroy would pay all wages and other employee benefits file all required reports with governmental agencies, and maintain all required personnel records; (e) all cost for the IT services would be included in the fees Stryker paid to Pomeroy; and (f) Pomeroy would pay all cost of training the IT personnel.

Stryker argued in its motion that it did not exercise control over matters concerning Robinson's employment, such as his hiring, wages, hours or working conditions. It contended that Robinson, and all other "Deskside IT Technicians" (hereafter, Deskside IT Techs) assigned by Pomeroy to Stryker's various facilities, were Pomeroy employees, with Pomeroy determining the number of such technicians required to work on-site at Stryker at any given time. Stryker asserted that Pomeroy's Deskside IT Techs, including Robinson, did not report to Stryker; rather, their work was managed by,

3

and they reported to, Pomeroy.  Accordingly, Stryker argued that Robinson had no standing to assert a PAGA claim against Stryker, as he was neither a current nor former employee of that company.  (See *Kim*, *supra*, 9 Cal.5th at p. 81.)

Robinson opposed the motion.  He asserted that he had been "jointly employed" and that Stryker had been his "joint employer."  Robinson argued that his primary supervisor while working as a Deskside IT Tech at Stryker's San Jose facility was Lettie Carrisales (Carrisales), a Stryker employee, and he was hired because she had " 'liked [him].' "  Robinson contended that he "considered [Carrisales] to be 'upper-level management,' " and that she supervised the five Deskside IT Techs (including himself) who worked at Stryker's San Jose facility.  He asserted further that he had little contact at all with Ben DeYoung (DeYoung), Pomeroy's Operations Manager, and that DeYoung "had almost no involvement in the management of the Desktop IT Technicians."  He "viewed himself as an employee of Stryker, not Pomeroy."  Robinson argued in opposing summary judgment that he had therefore raised a triable issue of fact as to whether he was s Stryker employee.

After hearing argument and submitting the matter, the court on July 6, 2022, filed a comprehensive and well-reasoned order granting Stryker's motion for summary judgment.  The court reasoned that the question of whether Robinson was an employee of Stryker was governed by the California Supreme Court's decision in *Martinez v. Combs* (2010) 49 Cal.4th 35 (*Martinez*).  As the trial court explained, under *Martinez*, there are "three alternative tests for analyzing employment status:  '(a) to exercise control over the wages, hours, or working conditions, *or* (b) to suffer or permit to work, *or* (c) to engage, thereby creating a common law employment relationship.'  (*Martinez*, *supra*, 49 Cal.4th at p. 64 [italics in original].)"  The trial court concluded that Robinson had failed to raise a triable issue of material fact supporting an employment relationship with Stryker under any of the three alternative tests enunciated in *Martinez*.  The court found that "[Robinson's] conclusions and subjective statements fail[ed] to raise a triable issue of

4

fact," and it, accordingly, granted the motion for summary judgment.[3] Judgment was thereafter entered on August 8, 2022.

## II. DISCUSSION

### A. Summary Judgment

Motions for summary judgment are governed by Code of Civil Procedure section 437c.[4] Summary judgment may be granted only if it disposes of the entire action. (*Id.*, subd. (a)(1) [motion proper when "it is contended that the action has no merit or that there is no defense to the action"]; see also *All Towing Services LLC v. City of Orange* (2013) 220 Cal.App.4th 946, 954 ["[s]ummary judgment is proper only if it disposes of the entire lawsuit"].) "The purpose of the law of summary judgment is to provide courts with a mechanism to cut through the parties' pleadings in order to determine whether, despite their allegations, trial is in fact necessary to resolve their dispute." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 843 (*Aguilar*).) Although in the 1980's and 1990's, summary judgment motions were viewed by the courts much less favorably than today (see *Perry v. Bakewell Hawthorne, LLC* (2017) 2 Cal.5th 536, 542), the motion

---

[3] The trial court also addressed a pleading argument raised in Stryker's reply memorandum. Stryker argued that Robinson's opposition based upon the theory that he had been jointly employed by Pomeroy and Stryker was beyond the scope of his complaint and could not be the basis for opposing summary judgment. (See, e.g., *Nieto v. Blue Shield of California Life & Health Ins. Co.* (2010) 181 Cal.App.4th 60, 74 ["the pleadings determine the scope of relevant issues on a summary judgment motion"].) The court chose to disregard Stryker's pleading objection, concluding that "[w]hether Stryker is Plaintiff's sole employer or should be considered jointly liable with Pomeroy for the alleged wage and hour violations is immaterial (and therefore no amendment to the pleading would change the result), because the test for employer status as set forth in *Martinez* is the same." Stryker renews the argument on appeal, asserting that Robinson waived the right to claim that Stryker was his joint employer by failing to allege it in his complaint, and the judgment should be affirmed on this basis. We agree with the trial court's reasoning and will therefore reject Stryker's suggestion that the judgment should be affirmed on the basis of Robinson's failure to plead joint employment.

[4] Further unspecified statutory references are to the Code of Civil Procedure.

5

procedure "is now seen as 'a particularly suitable means to test the sufficiency' of the plaintiff's or defendant's case. [Citations.]" (*Ibid.*)

The moving party "bears the burden of persuasion that there is no triable issue of material fact and that he [or she] is entitled to judgment as a matter of law." (*Aguilar*, *supra*, 25 Cal.4th at p. 850, fn. omitted.) A defendant moving for summary judgment must " 'show[ ] that one or more elements of the cause of action . . . cannot be established' by the plaintiff." (*Id.* at p. 853, quoting § 437c, subd. (o)(2).) A defendant meets its burden by presenting affirmative evidence that negates an essential element of the plaintiff's claim. (*Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 334 (*Guz*).) Alternatively, a defendant meets its burden by submitting evidence "that the plaintiff does not possess, and cannot reasonably obtain, needed evidence" supporting an essential element of its claim. (*Aguilar*, *supra*, at p. 855.) "Once the defendant meets the foregoing burden, 'the burden shifts to the plaintiff . . . to show that a triable issue of one or more material facts exists as to that cause of action . . . [and] set forth the specific showing that a triable issue of material fact exists as to that cause of action . . . .' [Citation.]" (*Saelzler v. Advanced Group* 400 (2001) 25 Cal.4th 763, 780 (*Saelzler*), quoting § 437c, subd. (o)(2).) The existence of a triable issue of material fact is shown "if, and only if, the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof." (*Aguilar*, *supra*, at p. 850, fn. omitted.)

"In ruling on the motion, the court must 'consider all of the evidence' and 'all' of the 'inferences' reasonably drawn therefrom [citation]." (*Aguilar*, *supra*, 25 Cal.4th at p. 843.) In considering the parties' evidence in connection with a motion for summary judgment, the court "strictly scrutinize[es]" the declarations submitted by the moving party and "liberally constru[es]" those offered by the opposing party, and it "resolv[es] any evidentiary doubts or ambiguities in [the opposing party's] favor." (*Saelzler*, *supra*, 25 Cal.4th at p. 768; see also *Aguilar*, *supra*, at p. 843.)

6

But "[o]nly *admissible evidence* is liberally construed in deciding whether there is a triable issue." (*Bozzi v. Nordstrom, Inc.* (2010) 186 Cal.App.4th 755, 761, original italics; see also *Hayman v. Block* (1986) 176 Cal.App.3d 629, 643 [in ruling on a summary judgment motion, "the court is bound to consider the competency of the evidence presented"].) "Further, an issue of fact is not raised by 'cryptic, broadly phrased, and conclusory assertions' [citation], or mere possibilities [citation]." (*Sinai Memorial Chapel v. Dudler* (1991) 231 Cal.App.3d 190, 196-197 (*Sinai Memorial*).) Thus, although the opposing party may rely upon inferences, "those inferences must be reasonably deducible from the evidence, and not such as are derived from speculation, conjecture, imagination, or guesswork. [Citation.]" (*Joseph E. Di Loreto, Inc. v. O'Neill* (1991) 1 Cal.App.4th 149, 161 (*Joseph E. Di Loreto, Inc.*); see also *Foltz v. Johnson* (2017) 16 Cal.App.5th 647, 662 (*Foltz*) ["[s]peculative possibilities are not substantial evidence" sufficient to raise a triable issue of fact to defeat summary adjudication]; *Kim v. Westmoore Partners, Inc.* (2011) 201 Cal.App.4th 267, 281 [opposing declarations containing " 'general and vague charges' " are insufficient to raise competent evidence showing triable issue of material fact]; *Knapp v. Doherty* (2004) 123 Cal.App.4th 76, 99 (*Knapp*) [" '[s]peculation . . . is not evidence' that can be utilized in opposing a motion for summary judgment"].)

Since summary judgment motions involve pure questions of law, we review independently the granting of summary judgment to ascertain whether there is a triable issue of material fact justifying the reinstatement of the action. (*Wiener v. Southcoast Childcare Centers, Inc.* (2004) 32 Cal.4th 1138, 1142.) In doing so, we "consider[] all of the evidence the parties offered in connection with the motion (except that which the court properly excluded) and the uncontradicted inferences the evidence reasonably supports. [Citation.]" (*Merrill v. Navegar, Inc.* (2001) 26 Cal.4th 465, 476.) We need not defer to the trial court and are not bound by the reasons in its summary judgment ruling; we review the ruling of the trial court, not its rationale. (*Kids' Universe v.*

7

*In2Labs* (2002) 95 Cal.App.4th 870, 878.)  Therefore, " '[w]e may affirm the summary judgment on any correct legal theory, as long as the parties had an adequate opportunity to address the theory in the trial court.  [Citation.]'  [Citation.]" (*Gray v. La Salle Bank, N.A.* (2023) 95 Cal.App.5th 932, 948.)

> ### B.    *Martinez v. Combs*

*Martinez, supra*, 49 Cal.4th 35 is the seminal case governing Robinson's contention that he presented sufficient evidence that Stryker had been his employer.  There, several plaintiffs, seasonal farmworkers, brought various wage claims, including the violation of minimum wage laws under Labor Code section 1194 against the strawberry grower that employed them (Grower) and two produce merchants (Merchants) that purchase Grower's harvested strawberries; the plaintiffs alleged that Grower and Merchants were their joint employers.  (*Martinez*, *supra*, at p. 48.)  The California Supreme Court stated that the issue before it was "[h]ow then do we define the employment relationship, and thus identify the persons who may be liable as employers, in actions under [Labor Code] section 1194?"  (*Id.* at p. 51.)  Giving deference to the interpretation of the definition of the employment relationship utilized in Wage Order No. 14 promulgated by the Industrial Welfare Commission (IWC) of this state (see *Martinez*, *supra*, at pp. 60-62, 64), the high court in *Martinez* adopted the IWC's three-part definition identified by the trial court below, namely that "[t]o employ . . . means: (a) to exercise control over the wages, hours or working conditions, *or* (b) to suffer or permit to work, *or* (c) to engage, thereby creating a common law employment relationship" (*id.* at p. 64, original italics).  As we discuss, *post*, Robinson does not argue on appeal that he was a Stryker employee under either the second or third *Martinez* criteria, and he has thus abandoned those arguments.  We will therefore only consider whether Stryker was an employer because he "exercise[d] control over the wages, hours or working conditions" of Robinson.  (*Ibid*.)

8

Applying the "control" aspect of this employment definition, the *Martinez* court examined and rejected the plaintiffs' argument that the activities of Merchants' field representatives in interacting with Grower's foremen and individual workers constituted " 'exercis[ing] control over [their] . . . working conditions' " sufficient to find that Grower and Merchants jointly employed the plaintiffs. (*Martinez, supra*, 49 Cal.4th at p. 75.) The evidence was that in the mornings of harvest days, Merchants' "representatives would explain to [Grower] and his foremen how the merchant wanted strawberries packed, and [Grower] and his foremen would demonstrate the packing style to the workers. For about an hour, the representatives, together with [Grower] and his foremen, would check the packed containers as workers brought them from the field to the truck where they would be loaded for shipping. While the representatives would generally bring problems to the attention of [Grower] and his foremen, they would also sometimes speak directly to the workers, pointing out mistakes in packing such as green or rotten berries. In the afternoon, the representatives would return briefly to check the quality and quantity of berries in the loaded truck." (*Id.* at p. 76.) The high court noted that "picking and packing strawberries for fresh market sale necessitated close communication during the harvest between [Merchants] and [Grower's] personnel . . . because market berries are packed in the field, as they are picked, into the containers in which they will be sold to consumers, often that same day or the next." (*Id.* at p. 75.) The high court held that this level of interaction between the putative employers and Grower's farmworkers did not constitute supervision or control over their working conditions to warrant a finding that Merchants were joint employers. (*Id.* at p. 76.)

In instances involving a variety of business settings, California appellate courts have applied the legal principles and reasoning of the Supreme Court in *Martinez, supra*, 49 Cal.4th 35 in upholding defense summary judgment orders that were granted because of the absence of an employment relationship between the plaintiffs and the putative employers. (See, e.g., *Taylor v. Financial Casualty & Surety, Inc.* (2021) 67 Cal.App.5th

9

966 (*Taylor*) [action by fugitive recovery personnel having agency relationships with bail bonds companies, alleging, inter alia, Labor Code violations against surety guaranteeing bond principal's performance not maintainable; surety was not plaintiffs' employer]; *Henderson v. Equilon Enterprises, LLC* (2019) 40 Cal.App.5th 1111 [action by manager of Shell-branded third-party service station operator against petroleum company (Shell Oil)/lessor of service station for alleged wage and hour violations dismissed; Shell Oil was not plaintiff's employer]; *Aleksick v. 7-Eleven, Inc.* (2012) 205 Cal.App.4th 1176 (*Aleksick*) [action by employee of convenience store franchisee against franchisor (7-Eleven) under Unfair Competition Law alleging wage and hour violations; franchisee's weekly use of 7-Eleven's payroll processing service as required under franchise agreement did not render 7-Eleven plaintiff's employer]; *Futrell v. Payday California, Inc.* (2010) 190 Cal.App.4th 1419 (*Futrell*) [action by employees of television commercial production firm against its payroll processing company for alleged statutory federal and state labor violations dismissed; payroll processing company was not plaintiffs' employer].)

### C. Whether Stryker Met Its Summary Judgment Burden

We first examine whether Stryker met its initial burden in moving for summary judgment by showing there was no triable issue of material fact to support Robinson's complaint. In doing so, we will detail the moving party's evidence to assess whether Stryker demonstrated "that the plaintiff does not possess, and cannot reasonably obtain, needed evidence" supporting an essential element of its claim. (*Aguilar*, *supra*, 25 Cal.4th at p. 855.)

#### 1. Master Services Agreement (MSA)

Stryker develops, manufactures, and sells medical devices related to orthopedics, surgery, neurotechnology, and spine care. (*Undisputed.*)[5] Pomeroy is a professional IT

---

[5] The majority of the Undisputed Material Facts (UMF) identified in Stryker's motion for summary judgment (see § 437c, subd. (b)(1)) were described in Robinson's

services company that "perform[s] infrastructure support services for its clients." (*Undisputed.*) On or about July 13, 2017, Stryker and Pomeroy entered into the Services Agreement under which Pomeroy agreed to provide Stryker with IT services through Pomeroy's employees that it identified as a group as "deskside IT technicians." (*Undisputed.*) The job of the Deskside IT Tech was to maintain, diagnose, troubleshoot, and repair software and hardware for computers and other devices used by Stryker employees. (*Undisputed.*) Stryker itself did not have any employees that performed the functions of the Deskside IT Techs.

Relevant provisions of the Services Agreement between Pomeroy and Stryker—all of which were not disputed in Robinson's summary judgment opposition—included the following:

(1) "Pomeroy . . . shall be the employer in law and in fact of all persons assigned to [Stryker] perform the Services."

(2) "Pomeroy's employees . . . shall [not] be deemed employees of [Stryker]."

(3) Pomeroy assumed the responsibility of supervising the Pomeroy IT personnel assigned to Stryker, and Pomeroy was "responsible for [its] own staff assigned to provide Services and [had] the sole right to direct and control the management of such staff."

(4) Pomeroy was responsible for "(a) determin[ing] and pay[ing] all applicable wages and salaries . . . ; (b) provid[ing] welfare and retirement benefits . . . ; (c) compl[iance] with applicable tax laws, including income tax and employment tax withholding laws; (d) compl[ying] with all applicable laws . . . including laws relating to accommodation of disabilities, equal pay, provision of leave . . . , unlawful discrimination, as well as wage and hour law requirements;

opposition as "Undisputed." We identify those facts delineated in Stryker's motion that Robinson did not dispute with the designation "(*Undisputed*)."

11

(e) comply[ing] with all workers' compensation insurance coverage laws; (f) fil[ing] all applicable reports with federal, state and local agencies and authorities as required by law; (g) maintain[ing] all required employment records, including I-9, personnel and medical files consistent with applicable law and customary business practices; and (h) comply[ing] with all applicable equal employment opportunity laws."

(5) The entire cost for "providing and retaining Pomeroy staff . . . [was] included within the fees" paid by Stryker, including "all wages, applicable payroll taxes, and all associated staffing costs such as training and education, recruiting and relocation expenses."

(6) Pomeroy was responsible for, and was to pay all costs associated with, any training of the Deskside IT Techs.

(7) Pomeroy was responsible for "tak[ing] all necessary efforts and precautions to ensure compliance with any other laws, rules or regulations regarding co-employment so as to protect [Stryker] from being found . . . a co-employer of any person performing the Services" at Stryker.

(8) Pomeroy was responsible for "maintain[ing] records relating to all personnel provided pursuant to [the MSA]," including "verification of qualifications, licenses, certifications, and references, verifying that such personnel are qualified in light of applicable law, industry standards, and [the MSA], to perform the work contracted for herein."  And Pomeroy was responsible for "maintain[ing] records of in-service training and records of assignments."

(9) If Stryker had a reasonable belief that any of the Deskside IT Techs' "performance or conduct . . . [was] unsatisfactory" and communicated that complaint to Pomeroy in writing, Pomeroy was obligated to "promptly address the performance or conduct of such person" including the possible replacement of that employee.

## 2.     *Performance Under the MSA*

Pomeroy, according to DeYoung, hired its own employees that it assigned to work at Stryker facilities, and it "direct[ed] the Deskside IT Technicians when and where to work, based on Pomeroy's independent assessment of the scope of work." Pomeroy decided solely the number of Deskside IT Techs required for the various on-site Stryker locations. Pomeroy charged Stryker a flat monthly fee for the work performed by Deskside IT Techs, and that fee did not fluctuate depending on the number of collective hours they worked in a given month. (*Undisputed.*) Pomeroy's Deskside IT Techs, including Robinson, applied to Pomeroy, not Stryker, for positions of employment. The Deskside IT Techs were paid by Pomeroy, not by Stryker. (*Undisputed.*)

DeYoung, who was at the relevant times Pomeroy's Service Manager, supervised the Deskside IT Techs, including Robinson. DeYoung declared that Pomeroy, not Stryker, established "the start date, weekly schedule, daily scheduled hours, and rate of pay" of the Deskside IT Techs, including Robinson. Pomeroy gave the Deskside IT Techs daily assignments and direction on specifically assigned tasks. The Deskside IT Techs did not report to anyone at Stryker; Carrisales, a Stryker employee, never supervised the Deskside IT Techs, and she had no day-to-day oversight over them.

The duties of the Deskside IT Techs at Stryker were based upon a ServiceNow ticketing system under which Stryker employees needing IT support submit applications (tickets). The tickets were routed to Pomeroy, which assigned the work to individual Deskside IT Techs; no one at Stryker had the responsibility to assign work requested in the tickets. If a task in the ticket request required prioritization, DeYoung at Pomeroy communicated that fact to the assigned Deskside IT Tech. On occasions where DeYoung was unavailable, Carrisales so advised the assigned Deskside IT Tech; she did not, however, have responsibility to assign work to the Deskside IT Techs.

Pomeroy was responsible for keeping track of the hours, overtime, and meal and rest breaks of the Deskside IT Techs, based upon timesheets submitted by the employees,

13

which were modified or approved on a weekly basis by DeYoung. (*Undisputed.*) Stryker was not responsible for tracking the hours, including overtime, worked by the Deskside IT Techs, and it did not review (or even have access to) their timesheets. (*Undisputed.*) Pomeroy, not Stryker, was also responsible for reviewing and approving expense reimbursement requests of Deskside IT Techs. (*Undisputed.*) Pomeroy directly compensated the Deskside IT Techs for their services, and it provided them with year-end wage statements and a W-2 forms. (*Undisputed.*) Stryker did not compensate the Deskside IT Techs for their work, and it provided no benefits, such as health benefits and vacation, to them. (*Undisputed.*)

Pomeroy, through DeYoung—not Stryker—was responsible for evaluating the work of the Deskside IT Techs and providing them with feedback concerning their performance. Pomeroy, through DeYoung, made decisions concerning any disciplinary action required involving the Deskside IT Techs, and it was Pomeroy's decision alone in determining what level of discipline, including termination, was appropriate.

### 3. *Hiring of Robinson*

In March 2019, Robinson applied for employment with Pomeroy. He was recruited for the position by a Pomeroy recruiter. (*Undisputed.*) DeYoung interviewed Robinson by telephone, and DeYoung told him that he would need to take a drug test with Pomeroy before he could be hired. (*Undisputed.*) DeYoung, on behalf of Pomeroy, made the decision to hire Robinson as a Deskside IT Tech. Although Carrisales of Stryker met with Robinson before his hiring, she did not offer him a Deskside IT Tech position. (*Undisputed.*) Carrisales did not make the decision to hire Robinson; she did not provide him with new-hire documents or a Stryker employee handbook.

On March 18, 2019, DeYoung sent an offer letter to Robinson, accepted by him, confirming his employment with Pomeroy and the employment benefits for which he was eligible. (*Undisputed.*) The offer letter indicated that Robinson's manager would be DeYoung. Based upon that hiring, Robinson became eligible for Pomeroy's medical and

14

dental plans, its 401(k) plan, Pomeroy's long-term disability plan, and its group life insurance program.. (*Undisputed*.) The offer letter makes no mention of Stryker. (*Undisputed*.) Robinson also received Pomeroy's employment handbook, and he acknowledged and agreed that he had received, read, and understood it, and that he agreed to adhere to Pomeroy's regulations, policies, and procedures. (*Undisputed*.) Robinson received an employee ID number from Pomeroy. (*Undisputed*.) He completed an Employment Eligibility Verification form (I-9 form) identifying his employer as Pomeroy. (*Undisputed*.)

Robinson received no offer letter from Stryker, as that company does not make employment offers to Deskside IT Techs or make them employees by giving them new-hire documents or a company employment handbook. (*Undisputed*.) He did not receive an employee ID number from Stryker. (*Undisputed*.) Robinson never received an I-9 form from Stryker. (*Undisputed*.)

### 4. Robinson's Work

Pomeroy assigned Robinson to give IT support as an on-site Deskside IT Tech at Stryker's San Jose facility. (*Undisputed.*) As noted, DeYoung at Pomeroy, not Stryker, had supervisory duties over Robinson while he worked at Stryker's San Jose facility as an on-site Deskside IT Tech. Robinson submitted his timesheets to Pomeroy. (*Undisputed.*)[6]

Robinson received wage statements and paychecks (by direct deposit as authorized by him) from Pomeroy, not Stryker. (*Undisputed.*) Pomeroy also provided Robinson with holiday and vacation pay, and a monthly communications allowance. (*Undisputed.*)

Based upon his hiring, Robinson voluntarily enrolled in Pomeroy's medical and dental plans, and its 401(k) plan. (*Undisputed.*) Stryker did not provide Robinson with

---

[6] Robinson testified that on one or more occasion, DeYoung followed up with him to remind him to submit his timesheets. (*Undisputed.*)

15

employee benefits such as health, dental, or vision insurance, life insurance, short-term disability, or vacation time. (*Undisputed.*)

### 5. *Robinson's Resignation*

On June 12, 2019, Robinson advised DeYoung that he was resigning his employment with Pomeroy, giving the company two-weeks' notice. (*Undisputed.*) During a subsequent exit interview, DeYoung instructed Robinson, notwithstanding his two-weeks' notice, to not return to work.

After Robinson ceased his employment, he indicated on a LinkedIn profile that he had been employed previously by Pomeroy. (*Undisputed.*) Robinson also listed in two places on an employment application that Pomeroy was his former employer and identified DeYoung as his former supervisor at that job. (*Undisputed.*)

The evidence presented by Stryker constituted a prima facie showing that it was not Robinson's employer. Since only an aggrieved employee has standing to assert a PAGA claim (see *Kim*, *supra*, 9 Cal.5th at p. 73), Stryker met its summary judgment burden by presenting affirmative evidence that negated an essential element of the Robinson's claim. (*Guz*, *supra*, 24 Cal.4th at p. 334; see also *Taylor*, *supra*, 67 Cal.App.5th at pp. 991-992 [defendant surety made prima facie showing that summary judgment was proper because it was not a joint employer of the plaintiff].)

### D. Whether Opposition Raised Triable Issue of Material Fact

As noted, the Supreme Court has held that there are three alternative tests in analyzing the existence of employment status. (See *Martinez*, *supra*, 49 Cal.4th at p. 64.) Robinson, in this appeal, addresses only the first test, i.e., whether the putative employer "exercise[s] control over the wages, hours or working conditions." (*Ibid.*) In his opening brief, Robinson merely recites the three alternative *Martinez* tests; he does not present argument in support of the claim that either the second test ("suffer or permit to work") or the third test ("engag[ing], thereby creating a common law employment relationship") applies in this instance. (See *ibid*.) Nor does he address these two tests in his reply

brief.[7]  Robinson has therefore abandoned any such claims.  (*Meddock v. County of Yolo* (2013) 220 Cal.App.4th 170, 175, fn. 2 [theories advanced in opposition to summary judgment at trial level that are not raised on appeal are deemed abandoned]; *Reyes v. Kosha* (1998) 65 Cal.App.4th 451, 466, fn. 6 [notwithstanding that "review of a summary judgment is de novo, it is limited to issues which have been adequately raised and supported in [appellant's] brief"].)  He is therefore limited to the argument that the evidence submitted in opposition to the motion raised a triable issue of material fact as to whether the putative employer, Stryker, "exercise[d] control over the wages, hours or working conditions" in this case.  (*Martinez*, *supra*, at p. 64.)  We address below Robinson's position, and the evidence he cites in support thereof, that the trial court erred in concluding that there was no triable issue of material fact raised that Stryker exerted control over Robinson's wages, hours, or working conditions.

### 1.  *Robinson's Interview and Hiring*

#### a.  **Stryker's Showing**

Stryker presented significant evidence that Pomeroy alone controlled the hiring of Robinson as a Deskside IT Tech.  His March 2019 employment application was with Pomeroy.  He never submitted a job application to Stryker.  Robinson was interviewed by Pomeroy's DeYoung, who told him that Pomeroy required drug testing before he could be hired.  (*Undisputed.*)  DeYoung, on behalf of Pomeroy, made the decision to hire Robinson as a Deskside IT Tech.  DeYoung sent Robinson an offer letter on March 18, 2019—which Robinson accepted—that did not mention Stryker and detailed the employment benefits for which he was eligible.  (*Undisputed*.)  Although Carrisales of Stryker met with Robinson, she did not (1) offer him a Deskside IT Tech position

---

[7] Stryker in its respondent's brief asserted that Robinson had only argued on appeal the applicability of the first *Martinez* test and that he thus waived any argument as to the two other tests of employment.  Robinson, in his reply brief, did not address Stryker's waiver argument.

(*Undisputed*); (2) make the decision to hire Robinson; (3) provide him with new-hire documents or a Stryker employee handbook; or (4) supply him with an offer letter on behalf of Stryker. (*Undisputed*).

### b. Robinson's Opposition

Robinson disputed two facts that Stryker had identified as "Undisputed Material Facts" (UMF), namely, that (a) "Pomeroy, in its sole discretion, hires and selects the personnel it assigns to perform IT support services on-site at Stryker business locations" (UMF No. 5); and (b) "the decision to hire Plaintiff to work for Pomeroy as a Deskside IT Technician was solely made by [Pomeroy's] Ben DeYoung." (UMF No. 24). Robinson contended in his response to UMF No. 5 that Stryker's "Carrisales[] hires and selects the personnel it assigns to perform IT support services . . ." Robinson further contended, in response to UMF No. 24, that "Lettie Carrisales (Stryker) made the decision to hire Plaintiff Robinson."

To support his position, Robinson offered his deposition testimony that after a "short phone interview" with DeYoung,[8] "he scheduled [Robinson] for an interview with Lettie Carrisales" that occurred at Stryker the next day; a Deskside IT Tech with Pomeroy, Bosa, was also present. Robinson testified that he had understood that "if Lettie liked [him], then the next stage [is] the hiring process, whatever that is." He testified further that Carrisales "hired" him.

It is evident from a review of the record that Robinson's testimony that he was "hired" by Carrisales was not based upon personal knowledge (see § 437c, subd. (d)),

---

[8] Robinson testified that he didn't remember the length of his interview with DeYoung, and that it could have lasted more than 30 minutes. Robinson also testified that he did not recall precisely what DeYoung said in the interview about the Deskside IT Tech position, "because a lot of these interviews that I have just kind of all seem the same."

and constituted speculation.[9]  Further, Robinson presented no competent evidence to refute UMF No. 5 that Pomeroy is the entity that hired Deskside IT Techs.  Robinson's showing therefore may not be considered in refutation of Stryker's clear evidence that (1) Pomeroy was vested with sole discretion in the hiring of Deskside IT Techs in general, and (2) specifically, DeYoung of Pomeroy was solely responsible for the decision to hire Robinson as a Deskside IT Tech ultimately assigned to Stryker's San Jose facility.  (See *Foltz*, *supra*, 16 Cal.App.5th at p. 662 ["[s]peculative possibilities are not substantial evidence" to oppose summary judgment motion]; *Knapp*, *supra*, 123 Cal.App.4th at p. 99 [speculation may not form the basis of a summary judgment opposition]; see also *General Motors Corp. v. Superior Court* (1993) 12 Cal.App.4th 435, 442 (*General Motors*) [rejecting statements in attorney's declaration that were not based upon his personal knowledge].)[10]

---

[9] Robinson testified that the basis for his belief that Carrisales hired him was that "she's the one [who] interviewed [him] and asked [him] the questions" and "she was [his] manager, and [he] worked for her."  He testified further that "[I]s it true that I don't know who . . . made the decision to hire me?· I know [Carrisales] had a big say in that because I sat right next to her.· I am not sure.· It could have been . . . multiple people, whoever was looking at my résumé, whoever was looking at my qualifications.· *I don't know how . . . they make their hiring decisions.*· I mean, the recruiter, Caleb, it could have been his decision, it could have been [DeYoung's] decision.· They all could have talked about it together.· *[I'm] not sure how the -- how the hiring process works*.· I just know I interviewed and got a job, very easily."  (Italics added.)

[10] Robinson also disputed the material facts that (a) "Deskside IT Technicians do not (and Plaintiff did not) apply for employment with Stryker" (UMF No. 8); and (b) "Plaintiff applied for a job with Pomeroy on March 18, 2019 . . . [as a] Deskside IT Technician" (UMF No. 19).  His response to both was that "Deskside IT technicians apply for employment with Stryker through Pomeroy."  This conclusory statement— which is not supported by the evidence Robinson cited in his opposition—is insufficient to raise a triable issue of fact.  (See *Sinai Memorial*, *supra*, 231 Cal.App.3d at p. 196 [" 'conclusory assertions' " insufficient to raise triable issue of fact].)

19

### 2. *Control Over Wages and Hours*

#### a. Wages

" '[C]ontrol over wages' means that a person or entity has the power or authority to negotiate and set an employee's rate of pay, and not that a person or entity is physically involved in the preparation of an employee's paycheck." (*Futrell*, *supra*, 190 Cal.App.4th at p. 1432.) Stryker established in its motion that Pomeroy was the entity that controlled Robinson's wages.

Pomeroy, not Stryker, directly compensated the Deskside IT Techs for their services, and it provided them with year-end wage statements and a W-2 forms. Robinson received wage statements and paychecks (by direct deposit as authorized by him) from Pomeroy, not Stryker. As part of his compensation package with Pomeroy, Robinson received from Pomeroy holiday and vacation pay, and a monthly communications allowance. He also enrolled in, Pomeroy's medical and dental plans, and its 401(k) plan. Each of these material facts identified in Stryker's motion was undisputed by Robinson.

Robinson submitted no evidence in his opposition that raised a triable issue of fact to refute that Pomeroy was the entity that was responsible for compensating the Deskside IT Techs in general, and Robinson, in particular.

#### b. Hours

Stryker presented evidence (through DeYoung's declaration) that Pomeroy, through DeYoung, not Stryker, established "the start date, weekly schedule, daily scheduled hours, and rate of pay" of the Deskside IT Techs, including Robinson. Robinson did not dispute that the Deskside IT Techs–including Robinson—submitted timesheets to Pomeroy, and that entity was responsible for keeping track of their hours, overtime, and meal and rest breaks. And Robinson did not dispute that Stryker had no responsibility for tracking the hours, including overtime, worked by the Deskside IT Techs, and it did not review (or even have access to) their timesheets.

20

In addressing Stryker's contentions concerning Pomeroy's control over the hours of Robinson and the other Techs, Robinson disputed four UMF's identified in the motion: (a) "Pomeroy (not Stryker) sets the start date, weekly schedule, daily scheduled hours, and rate of pay for Plaintiff and the other Deskside IT Technicians" (UMF No. 16); (b) "Pomeroy set Plaintiff's daily scheduled working hours, which were 8:00 a.m. to 5:00 p.m. Monday to Friday" (UMF No. 31); (c) "Pomeroy, not Ms. Carrisales, was responsible for tracking hours and overtime worked by Deskside IT Technicians, as well as their meal and rest breaks" (UMF No. 56); and (d) if there were any questions by Deskside IT Techs concerning "their hours, wages, overtime pay, meal or rest breaks, wage statements, or expense reimbursements, they [were] directed to address these with Pomeroy" (UMF No. 58).

Robinson asserted that his deposition testimony served to refute Stryker's UMF Nos. 16 and 31 that Pomeroy set his weekly and daily schedules. The evidence he cited was his testimony that he was "scheduled to do whatever [his] manager [Carrisales] would tell [him] to do" and "would be asked to come in earlier" if there were a conference or a meeting. Other Robinson deposition testimony, however, belied his attempt to refute that it was Pomeroy that set his schedule and hours. Robinson testified that he "*would assume* [Carrascales]" was the one who determined that his schedule would be 8:00 a.m. to 5:00 p.m., Monday through Friday. (Italics added.) Robinson's speculation on this issue was underscored when he was asked later in his deposition to identify the person who asked him to come to work earlier than 8:00 a.m., and he responded, "If anyone asked, it would be [Carrisales]." Speculation and statements not based upon personal knowledge do not constitute admissible evidence to oppose summary judgment. (*Knapp*, *supra*, 123 Cal.App.4th at p. 99 [speculation]; *General Motors*, *supra*, 12 Cal.App.4th at p. 442 [declaration not based upon personal knowledge].)

21

Robinson's expressed dispute that Pomeroy was responsible for responding to inquiries and the tracking of Deskside IT Techs' hours, overtime, meal and rest breaks (UMF Nos. 56 and 58) was that "Carrisales (Skyler) not only monitored when Deskside IT Technicians took their meal and rest breaks, but also had the capability to create a lunch schedule that the Deskside IT Technicians would have to follow."[11]  The evidence cited by Robinson—excerpts from Carrisales's deposition and an e-mail that she authored—does not support this statement.  It only indicates that on one occasion, Carrisales sent an e-mail to the Deskside IT Techs (on which Robinson was *not* copied) in which she expressed concern that at noon on March 26, 2019, there was only one Deskside IT Tech present and he was unable to go to lunch.  She stated that " '[i]f this happens again, I will be setting up a lunch schedule.' "  This e-mail documented one incident of an apparent lack of personnel coordination with meal breaks.  Robinson presented no evidence that Carrisales (Stryker) ever actually implemented a meal break schedule for Deskside IT Techs.  Moreover, even were we to accept Robinson's premise that Carrisales's one communication involving one instance of an apparent lack of coordination with lunch breaks had any potential significance, her suggested future implementation of a lunch schedule did not rise to the level of her having control over the working conditions of the Deskside IT Techs.

Robinson's opposition did not refute UMF Nos. 16, 31, 56 and 58, and it did not present a triable issue of fact concerning whether Stryker had control over the hours, overtime, meal breaks, or rest breaks of the Deskside IT Techs.

---

[11] It is evident from the record that Robinson did not dispute that Pomeroy was responsible for hours and overtime issues pertaining to Deskside IT Techs.

### 3. Management/Supervision Role of Pomeroy

#### a. Stryker's Showing

Stryker presented a significant amount of detail in its motion showing that Pomeroy, not Stryker, exercised control over the working conditions of the Deskside IT Techs (including Robinson) assigned to Stryker facilities.

Starting with the July 2017 MSA that governed the IT outsourcing relationship between Stryker and Pomeroy—the existence and terms of which agreement were not disputed in Robinson's opposition—Pomeroy was identified as "the employer in law and in fact of all [Deskside IT Techs]"; assumed the responsibility of supervising the Deskside IT Techs and had "the sole right to direct and control the management of such staff." (See *Martinez*, *supra*, 49 Cal.4th at p. 77 [emphasizing that under contracts between Grower and the putative employers, Merchants, the latter had "no right to direct [Grower's] employees' work"]; *Taylor*, *supra*, 67 Cal.App.5th at pp. 992-993 [emphasizing that under the parties' written agreements, bonding companies, not the putative employer surety, had " 'exclusive control' " over their employees, including setting their hours and the right to retain and discharge them].) Additionally, Pomeroy was to "take all necessary efforts and precautions to ensure compliance with any other laws, rules or regulations regarding co-employment so as to protect [Stryker] from being found . . . a co-employer of any person [of the Deskside IT Techs]." Further, under the MSA, it was Pomeroy (not Stryker) that was responsible for determining and paying all wages due to the Deskside IT Techs, complying with withholding requirements, providing workers' compensation coverage, filing required employee reports with the government, and "compl[ying] with all applicable equal employment opportunity laws." Pomeroy was required under the agreement to pay all costs associated with the Deskside IT Techs, and any such cost was included in the fees paid by Stryker for such services. Pomeroy was also responsible for all training of the Deskside IT Techs, and for maintaining all personnel records, including records of assignments.

In practice, Pomeroy hired its own employees that it assigned to work as Deskside IT Techs at Stryker facilities. All Deskside IT Techs who were ultimately placed at Stryker facilities, including Robinson, applied to Pomeroy for employment. As stated in the Carrisales and DeYoung declarations, it was undisputed that Pomeroy "direct[ed] the Deskside IT Technicians when and where to work." In Robinson 's specific case, Pomeroy assigned him to Stryker's San Jose location. It was solely Pomeroy's decision in setting the number of Deskside IT Techs required for a given Stryker site. (Cf. *Curry v. Equilon Enterprises, LLC* (2018) 23 Cal.App.5th 289, 303 [emphasizing that putative employer, lessor of Shell service station, did not control working conditions because it had no authority to determine number of employees of lessee to be assigned or to determine number of hours to be worked by them].) It was undisputed that Pomeroy charged Stryker a flat monthly fee for the work performed by Deskside IT Techs.

Pomeroy supervised the Deskside IT Techs. This included DeYoung's supervision of Robinson. DeYoung established "the start date, weekly schedule, daily scheduled hours, and rate of pay" of the Deskside IT Techs, including Robinson. Pomeroy gave the Deskside IT Techs daily assignments and direction on specifically assigned tasks. The Deskside IT Techs did not report to Carrisales or anyone else at Stryker. Pomeroy evaluated the work of the Deskside IT Techs and gave them feedback concerning their performance. Pomeroy made decisions concerning any disciplinary action of Deskside IT Techs, and it alone decided what level of discipline, including termination, was appropriate.

### b. Robinson's Opposition

Robinson disputes UMF's identified in Stryker's motion that are central to whether Stryker exerted control over his work as a Deskside IT Tech. These facts related to the entity responsible for (a) assignment of personnel to Stryker facilities, (b) assignment of specific IT projects, (c) the overall supervision and day-to-day management of Deskside IT Techs, and (d) employee discipline (including termination

24

or removal of an employee from a particular assigned Stryker facility).  The particular identified facts, as discussed below, are:  UMF Nos. 7, 9, 14, 15, 17, 18, 42, 43, 45, 47, and 59.

### (1)    Overall Supervision of IT Techs

Robinson, in his opposition, disputed three undisputed material facts in the motion related to the overall management of the Deskside IT Techs.  They were (a) Deskside IT Techs, although performing services on devices used by Stryker employees, did not report to Stryker, and during the relevant time period, the Deskside IT Techs assigned to Stryker's San Jose facility reported to Pomeroy' DeYoung (UMF No. 15); (b) DeYoung was Robinson's supervisor, and DeYoung supervised Robinson and the other Deskside IT Techs on a day-to-day basis (UMF No. 42); and (c) Carrisales did not supervise Robinson or the other Deskside IT Techs, and she did not have day-to-day oversight over Robinson or other Deskside IT Techs (UMF No. 43).

The evidence Robinson relies on his dispute of these material facts consists of his deposition testimony, which is conclusory, self-serving, and based upon speculation. Asserting that Carrisales "supervised Plaintiff and the Deskside IT Technicians," Robinson cites to his deposition testimony that Carrisales "manages the location," "was managing things," "managed everyone," was "upper-level management," and was "[his] manager."  A closer review of the evidence demonstrates that Robinson presented no competent evidence that Stryker, through Carrisales, managed the Deskside IT Technicians in general or Robinson in particular.

Robinson asserted in his opposition, based upon his testimony, that he "considered [Carrisales] to be 'upper-level management.' "  But the record shows that this was speculation.  In responding to a question as to the basis for his understanding that Carrisales was a salaried employee, Robinson testified:  "Because she was upper level management.·  She wasn't an hourly employee.·  I don't think she put in hours.·  I don't know.·  *I guess that's speculation.*·  I just don't—it wasn't my job to manage [Carrisales].·

25

It didn't matter.· If there was something—she was the only person there that was a manager." (Italics added.)

Similarly, Robinson cited his deposition testimony to purportedly show that Carrisales, not DeYoung, was the manager of the Deskside IT Techs assigned to Stryker's San Jose facility.  In responding to whether the five Deskside IT Techs (that included himself) reported to DeYoung, Robinson testified:  "I don't know what they reported to . . . [Carrisales].· I don't know what they reported to [DeYoung]." Robinson's testimony here also demonstrated a lack of personal knowledge and speculation regarding the potential roles of DeYoung and Carrisales as manager.[12]

Robinson also emphasized in his opposition to UMF No. 15 (Deskside IT Techs reported to Pomeroy's DeYoung, not to Stryker) that he had never met, and had only spoken with, DeYoung on approximately two occasions—prior to his hiring and when he resigned.  The fact that Robinson never met DeYoung and only spoke to him by telephone on a few occasions does not refute that DeYoung supervised the Deskside IT Techs, including Robinson.  In fact, Robinson's claim in opposing summary judgment that Carrisales, not DeYoung, was his manager is belied by (1) his deposition testimony that DeYoung was his supervisor at Pomeroy, and (2) the statement in an employment application later submitted by Robinson that identified his manager while employed *by Pomeroy* as *DeYoung*.

Robinson did not raise a triable issue of material fact that it was Stryker, rather than Pomeroy, that managed the work of the Deskside IT Techs, including Robinson. " ' "The employee's 'subjective beliefs . . . do not create a genuine issue of fact; nor do uncorroborated and self-serving declarations.' " ' [Citations.]" (*Taylor*, *supra*, 67

---

[12] Robinson's attorney objected to the question of whether the Deskside IT Technicians reported to DeYoung on the grounds of lack of personal knowledge and that it required speculation by the witness.  Robinson's answer to the question confirmed the validity of his own counsel's objections.

Cal.App.5th at p. 994.) Robinson's deposition testimony, with conclusory statements, speculation, and matters stated without personal knowledge concerning the management of the work did not constitute admissible evidence to refute Stryker's showing in its summary judgment motion. (See *Knapp*, *supra*, 123 Cal.App.4th at p. 99 [speculation]; *General Motors*, *supra*, 12 Cal.App.4th at p. 442 [declaration not based upon personal knowledge]; *Sinai Memorial*, *supra*, 231 Cal.App.3d at p. 196 [triable "issue of fact is not raised by 'cryptic, broadly phrased, and conclusory assertions' "].)[13]

### *(2) Assignment to Stryker Facilities*

There were two undisputed material facts stated in Stryker's motion relating to this issue that were disputed by Robinson. They were (a) Pomeroy was "solely responsible" for deciding the number of Deskside IT Techs needed at various Stryker locations, and it directed the timing and location of their work at Stryker (UMF No. 7); and (b) a Deskside IT Tech's tenure at a particular Stryker site varied, and Stryker did not have input on these issues (UMF No. 9). Robinson again relied on his deposition testimony that Carrisales "manages the location," "was managing things," and "managed everyone." He stated in his opposition that "Stryker, through its employee Lettie Carrisales, managed the Deskside IT Technicians, including how many technicians they needed and when and where they would work."

Robinson presented no *facts* refuting that Pomeroy was "solely responsible" for deciding the number and timing of the assignment of Deskside IT Techs required at the given Stryker locations, and that Stryker had no input on these issues. And for the reasons stated, *ante*, Robinson's conclusory and unsupported deposition testimony that Carrisales managed the Deskside IT Techs did not present a triable issue of fact as to whether Pomeroy was the entity responsible for the assignment of Deskside IT Techs to

---

[13] With regard to the assignment of work to Deskside IT Techs, Robinson also argued that it was Carrisales of Stryker who managed the ticket queue. We address this contention separately, *post*.

27

Stryker locations.  (See *Taylor*, *supra*, 67 Cal.App.5th at p. 994 ["[a]ffidavits must cite evidentiary facts, not legal conclusions or ultimate facts"].)

### (3)　Assignment of Specific Stryker IT Projects

Robinson disputed three undisputed material facts from Stryker's motion responsibility for the assignment of particular Stryker IT projects to Deskside IT Techs: (a) "[w]hen Stryker employees need technical support from a Deskside IT Technician, they submit a ticket in the ServiceNow application requesting assistance . . . [and] tickets are routed directly to Pomeroy, and Pomeroy [not Stryker] assigns the tickets to a Deskside IT Technician employed by Pomeroy."  (UMF No. 14); (b) "[w]hile Ms. Carrisales may coordinate with a Deskside IT Technician to handle an IT request from a Stryker employee, she does not give assignments to Deskside IT Technicians . . . [; t]hat was Pomeroy's responsibility" (UMF No. 45); and (c) "[i]f Plaintiff had any issues with the support portal, he was instructed to contact the Pomeroy Service Desk" (UMF No. 59).

Robinson, in attempting to refute UMF No. 14, cited his deposition testimony to the effect that it was Stryker (Carrisales), not Pomeroy, who was responsible for managing the ticket queue.  He testified:  "It wasn't [his] job to manage the ticket queue. . . .  That was [Carrisales]."  He later testified:  "We all managed [the ticket queue], but everything was managed by Stryker management.· They managed the queue, they created the system, and there was a workflow in the ticketing system."  He testified further that "there was a person . . . that sat right next to [Carrisales] that was the ServiceNow administrator.· And whoever in management at Stryker created the ticket system, and programmed everything to work that way, that's how it worked.· I had . . . no say in it.· I just worked the tickets.· I don't manage. [¶] . . . [¶] Because [Carrisales] would go to meetings about [the ticket queue].· She was Deskside Support Manager.· I was Deskside Support Technician.  She was my manager, at Stryker, and it was her job to manage me in the ticketing system, specifically ServiceNow; that's what she did."  Thus,

28

when questioned regarding the basis for his testimony that Carrisales (Stryker) managed the ticket queue, Robinson was unable to provide specific *facts* to support that conclusion.

Robinson's testimony consisted of conclusory statements, speculation, and matters not based upon his personal knowledge. It did not constitute admissible evidence raising a triable issue of fact refuting that Pomeroy was the entity responsible for the assignment of specific projects (i.e., managing the ticket queue) assigned to the Deskside IT Techs. (See *Knapp*, *supra*, 123 Cal.App.4th at p. 99 [speculation]; *General Motors*, *supra*, 12 Cal.App.4th at p. 442 [declaration not based upon personal knowledge]; *Sinai Memorial*, *supra*, 231 Cal.App.3d at p. 196 [" 'cryptic, broadly phrased, and conclusory assertions' "].)

### (4)  *Disciplining Deskside IT Techs*

Robinson disputed three undisputed material facts identified in Stryker's motion concerning issues relating to the evaluation and disciplining of Deskside IT Techs. They were (a) Pomeroy had the exclusive authority to terminate Deskside IT Techs (UMF No. 17); (b) although Stryker may request ending the assignment of a Deskside IT Tech at one of its facilities, "Pomeroy has the final decision-making authority" (UMF No. 18); and (c) although Carrisales at Stryker may have been informed of performance issues involving Deskside IT Techs, the information would be relayed to Pomeroy, and that entity had the sole discretion to decide what discipline, if any, would be appropriate (UMF No. 47).

In attempting to refute UMF Nos. 17 and 18, Robinson stated in his opposition that "Plaintiff Robinson gave his two weeks, but was then abruptly fired by Ben [DeYoung], Kelly,[14] and Lettice [*sic*]. Kelly and Lettice [*sic*] are Stryker employees." Robinson cited one short passage of his deposition testimony in support of this assertion.

---

[14] "Kelly" is apparently Kelly Duong, who was IT director employed by Stryker.

29

He testified that after sending a June 12, 2019 e-mail to DeYoung and Carrisales giving two-weeks' notice of his resignation, he had an exit interview that probably occurred the next day.[15]  Robinson testified that he worked only one day after he gave notice, because "at the end of the next day, [he] interviewed with [DeYoung], finished . . . [his] day.  On the drive home, *they* told [him] not to come back."  (Italics added.)  The following exchange (upon which Robinson relied in his summary judgment opposition) then took place:  "Q. And when you say 'they,' do you mean [DeYoung]?  [¶] A. *I guess, yeah.*  [¶] Q. I mean, is that the person who called you to say don't come back?  [¶] A. *I'm assuming—yeah, he's the one*—he was meeting, talking with Kelly and Lettie.· *So I think they all made the decision together.*· So he's the one that called me, telling me not to come back."  (Italics added.)  Robinson later admitted in his deposition that he had no personal knowledge as to who made the decision to terminate him.

Further, Robinson testified that he did not know who had the final authority to approve a transfer to another Stryker facility, had he made such a request.  He testified that he was never disciplined, and he had no knowledge of any other Deskside IT Techs having been disciplined.

Robinson presented no competent evidence that Stryker played any role in the disciplining, including termination, of any Deskside IT Tech.  (Cf. *Aleksick*, *supra*, 205 Cal.App.4th at p. 1180 [emphasizing that under franchise agreement, it was franchisee, not the putative employer-franchisor, who was responsible for "all matters pertaining to employees, such as hiring and firing, setting pay, and scheduling work"].)  And, specifically, Robinson offered no competent evidence that Stryker was involved in any decision to terminate him.  At best, his deposition testimony involved "speculation [and] conjecture" that Carrisales and Kelly were involved in some way in the termination

---

[15] The exit interview was conducted by DeYoung.  Robinson testified that he did not have an exit interview with Carrisales.

30

decision, which was inadmissible to oppose summary judgment. (*Joseph E. Di Loreto, Inc.*, *supra*, 1 Cal.App.4th at p. 161.)[16]

### E. Challenge to Evidentiary Ruling

Robinson included in his opposition to summary judgment certain documents obtained in discovery, labeled exhibits C through R, that were attached to the declaration of his counsel. All but one of the exhibits were internal e-mails sent by Carrisales. In its reply to the motion, Stryker filed objections to six of these exhibits, namely, exhibits F, J, K, N, O, and Q. The asserted objections in each instance were lack of foundation (Evid. Code, § 403), absence of personal knowledge (*id.*, § 702), and hearsay (*id.*, § 1200). Stryker contended, inter alia, that the exhibits were not authenticated either by counsel in his declaration, or by Carrisales in her deposition. The trial court sustained Stryker's objections, concluding that the six exhibits were not properly authenticated and were thus inadmissible.

On appeal, Robinson contends that the trial court erred in excluding four of these exhibits (J, K, N, and Q).[17] He contends that the exhibits were properly authenticated in his attorney's declaration, and that the court's ruling was "plain error." Stryker responds

---

[16] The cited evidence upon which Robinson relied in disputing UMF No. 47—that Pomeroy had the sole discretion to decide what discipline, if any, would be appropriate for Deskside IT Techs—consisted of his deposition testimony that he only spoke to DeYoung on about two occasions, and that Carrisales "was managing things," and "managed everyone." This did not refute that the decision to discipline Deskside IT Techs was vested solely in Pomeroy. Further, for the reasons stated, *ante*, none of this purported evidence was admissible to create a triable issue of fact that Stryker managed the Deskside IT Techs.

[17] He does not challenge the ruling excluding exhibits F and O, and he has waived any such challenge. (See *Tiernan v. Trustees of Cal. State University & Colleges* (1982) 33 Cal.3d 211, 216, fn. 4 [arguments made at trial level that are not asserted on appeal are deemed waived].) In the section of his opening brief addressing his challenge to the court's evidentiary ruling, Robinson identifies 10 other exhibits to his attorney's declaration. There was no evidentiary objection by Stryker as to these 10 exhibits and hence no ruling; they are not included in our discussion here.

that the trial court did not err because "Robinson did not identify what, if any, indicia established the authenticity of the exhibits—let alone clear indicia."

Robinson does not identify the appellate standard that governs our review of the challenged order. The California Supreme Court has not decided the issue. (See *Reid v. Google, Inc.* (2010) 50 Cal.4th 512, 535 [declining to decide whether standard of review of evidentiary rulings in connection with summary judgment motions is de novo or abuse of discretion].) However, "[t]he weight of authority" is that evidentiary rulings made by the trial court in connection with summary judgment motions are reviewed for abuse of discretion. (Weil & Brown, Cal. Practice Guide: Civil Writs and Appeals (Rutter Group 2024) ¶ 8:168; see also *Alexander v. Scripps Memorial Hospital La Jolla* (2018) 23 Cal.App.5th 206, 226 ["the weight of authority . . . holds that an appellate court applies an abuse of discretion standard" to evidentiary issues arising in the context of a summary judgment motion, except evidentiary rulings turning on questions of law, such as hearsay rulings, which are reviewed de novo].) The abuse of discretion standard of review has been applied by a number of courts considering a trial court's order excluding evidence proffered in the summary judgment context. (See, e.g., *San Francisco Print Media Co. v. The Hearst Corp.* (2020) 44 Cal.App.5th 952, 962 & fn. 7 [exclusion of expert testimony]; *Serri v. Santa Clara University* (2014) 226 Cal.App.4th 830, 852 (*Serri*) [exclusion of documents on authentication grounds].)

As a panel of this court has explained, "[d]ocuments obtained in discovery in response to a request for production of documents may be used to support or oppose a motion for summary judgment, but must be presented in admissible form. This means the evidence must be . . . properly identified and authenticated. . . . Unless the opposing party admits the genuineness of the document, the proponent of the evidence must present declarations or other 'evidence sufficient to sustain a finding that it is the writing that the proponent of the evidence claims it is.' [Citations.]" (*Serri, supra*, 226 Cal.App.4th at p. 855.) "[A]cceptable means of authentication" of documents submitted

32

in law and motion proceedings include submitting a declaration of counsel attaching relevant deposition excerpts in which the deponent authenticates the documents. (*Greenspan v. LADT, LLC* (2010) 191 Cal.App.4th 486, 523; see also *Serri*, *supra*, at p. 855 [noting that proponent of documents could have authenticated them, but did not do so, by propounding requests for admission asking the adverse party to admit their authenticity, or by asking the author to authenticate the documents while taking his or her deposition].)

Here, the sole statement in the declaration of counsel that purported to serve to authenticate the four exhibits excluded by the trial court was that the documents had been Bates-stamped and "produced by Stryker in response to Plaintiff's Requests for Production of documents." In support of his position that this was sufficient to authenticate the exhibits, Robinson relies on *Hooked Media Group, Inc. v. Apple Inc.* (2020) 55 Cal.App.5th 323 (*Hooked Media Group*). There, a panel of this court concluded that the trial court did not err in overruling objections that documents submitted by the party moving for summary judgment were not properly authenticated. (*Id.* at pp. 337-338.) It held that there were "clear indicia" that the documents—which the movant indicated had been produced in discovery and were accompanied by third-party custodian declarations identifying their origin—were as indicated by their proponent, and that, based upon the circumstances presented, the trial court did not err in their admission. (*Id.* at p. 338.) However, the fact that in *Hooked Media Group*, there was an attorney declaration indicating that the documents had been produced in discovery did not mean that such evidence, of itself, would *necessarily constitute sufficient authentication in all cases.* (See *People v. Goldsmith* (2014) 59 Cal.4th 258, 267 [proof necessary to authenticate evidence may vary between cases].)

The trial court concluded that "[Robinson] has not offered [any] evidence to establish the foundational facts necessary to authenticate Exhibits F, J, K, N, O, and Q." The court did not abuse its discretion by concluding that Robinson had not sufficiently

33

authenticated the exhibits and thus concluding that Stryker's objections were proper. (*Serri, supra*, 226 Cal.App.4th at p. 852; see also *id.* at p. 854 [court agrees with objecting party that " '[n]ot every document that comes out of an opposing party's files is automatically admissible against even that party' "].)[18]  Robinson failed to meet his burden of establishing that the trial court abused its discretion in making this evidentiary ruling in connection with the summary judgment motion.  (See *Duarte v. Pacific Specialty Ins. Co.* (2017) 13 Cal.App.5th 45, 52.)

But even were we to conclude that the trial court erred in excluding the evidence, such assumed error is not prejudicial.  It is axiomatic that "[t]he trial court's error in excluding evidence is grounds for reversing a judgment only if the party appealing demonstrates a 'miscarriage of justice'—that is, that a different result would have been probable if the error had not occurred.  [Citations.]" (*Zhou v. Unisource Worldwide* (2007) 157 Cal.App.4th 1471, 1480, quoting Evid. Code, § 354; see also *Twenty-Nine Palms Enterprises Corp. v. Bardos* (2012) 210 Cal.App.4th 1435, 1449 ["erroneous evidentiary ruling requires reversal only if 'there is a reasonable probability that a result more favorable to the appealing party would have been reached in the absence of the error' "].)

Here, the excluded evidence consisted of four Carrisales e-mails (1) asking to meet with Robinson to discuss the status of a project (exhibit J); (2) thanking a Stryker employee for expressing appreciation for Robinson's work (exhibit K); (3) reporting to Deskside IT Techs the number of tickets that had closed in April 2019 (exhibit N); and (4) reporting to Deskside IT Techs the number of tickets that had closed in May 2019 (exhibit Q).  It is clear from our discussion, *ante*, that these e-mails—considered

---

[18] We observe that Robinson in fact took the deposition of Lettie Carrasales, the author of the four excluded exhibits—excerpts of which deposition were attached to Robinson's opposition—and could have had the witness authenticate the documents at that time (but apparently did not do so).

individually or in conjunction with other evidence submitted by Robinson—did not raise a triable issue of material fact on the question of his purported employment by Stryker. We therefore reject Robinson's claim of error based upon the trial court's exclusion of evidence.

### F.     Conclusion

We have concluded that Stryker, as the party moving for summary judgment, met its burden of showing that Robinson's complaint had no merit. Stryker demonstrated that an element essential to Robinson's wage and hours claims was that he had been a Stryker employee, and there was no triable issue of material fact to support that element.

Stryker presented significant evidence that Pomeroy was Robinson's employer— and his sole employer. This evidence included the MSA, which provided detailed terms requiring that Pomeroy assume complete responsibility as an employer for all aspects of the employment of the Deskside IT Techs, including Robinson. The evidence also consisted of Pomeroy's having (a) recruited, interviewed, and hired Robinson; (b) assumed responsibility for the placement of Deskside IT Techs at the different Stryker facilities; (c) made all decisions regarding the number of persons assigned and hours to be worked at any given Stryker facility; (d) charged Stryker a flat fee for the assignment of Deskside IT Techs, regardless of the number of employees assigned or the hours they were required to work; (e) assumed the supervision of the Deskside IT Techs, including Robinson, including the making of daily assignments through the ticketing system; (f) exclusive responsibility for any disciplinary actions or transfers of Deskside IT Techs; (g) exclusive responsibility for tracking the hours of Deskside IT Techs, including Robinson, through review of timesheets submitted by the employees; (h) determined and provided the compensation for the Deskside IT Techs, including Robinson, as well as having issued paychecks, wage statements, and W-2 forms to them; and (i) assumed responsibility to maintain all personnel records and to file all documents required of governmental agencies.

Robinson admitted many of the undisputed material facts identified in Stryker's motion. Notably, however, he denied key UMF's, such as Pomeroy's having (1) hired Robinson, (2) assigned Deskside IT Techs to Stryker, (3) supervised them, and (4) responsibility for disciplining them. As we have discussed, the purported facts cited by Robinson to refute the UMF's consisted mostly of matters about which Robinson speculated and for which he lacked personal knowledge, i.e., incompetent evidence not admissible to oppose summary judgment. In short, Robinson, in response to Stryker's prima facie showing, did not meet his burden of demonstrating the existence of " 'a triable issue of one or more material facts . . . as to the cause of action . . . [by] set[ting] forth the specific facts showing that [such] a triable issue of material fact    exists . . ." (§ 437c, subd. (p)(2).)

In determining whether, applying the principles enunciated by our high court in *Martinez* in a wage and hour case such as the one here, an entity is a plaintiff's employer or co-employer, "[a] commonsense understanding of who 'employed' [plaintiff]—for purposes of compelling the payment of allegedly unpaid wages—must prevail . . ." (*Futrell*, *supra*, 190 Cal.App.4th at p. 1435.) In this regard, substance over form must be observed. (See, e.g., *Aleksick*, *supra*, 205 Cal.App.4th at pp. 1186-1190 [where franchise agreement provided that franchisee was an independent contractor responsible for store operations, including hiring, firing, setting salary, and paying employees, the fact that franchisor was responsible under the agreement to provide payroll services to franchisee did not render it an employer]; *Futrell*, *supra*, at pp. 1432-1433 [fact that payroll company, which did not hire, supervise, or provide work assignments to employees, provided payroll services to an advertising production company did not mean it controlled the employees' wages or that it was a co-employer].)

Robinson attempts to construe the role of Stryker employee Carrisales in communicating with Deskside IT Techs employed by Pomeroy on a day-to-day basis about their work as elevating the position of Stryker to co-employer. However, as

36

explained in *Martinez,* the fact that an entity has direct contact with employees of another entity, including discussing how work should be performed—in the case of *Martinez*, Merchants having contact with Grower's employees, or here, a company, Stryker, receiving the benefit of IT personnel employed by a separate outsourcing entity, Pomeroy, employing them—does not render the entity a co-employer.  (See *Martinez*, *supra*, 49 Cal.4th at pp. 75-76; see also *Taylor*, *supra*, 67 Cal.App.5th at pp. 1002-1003 [surety's contacts with fugitive recovery agents did not render surety an employer or joint employer].)

The record here shows that there was no triable issue of material fact that supported a finding that Robinson was employed by Stryker.  Since only an aggrieved employee has standing to assert a PAGA claim (see *Kim*, *supra*, 9 Cal.5th at p. 81), Robinson's complaint based upon wage and hour claims against Stryker was without merit.  Accordingly, the motion for summary judgment in favor of Stryker was properly granted.

## III.    DISPOSITION

The August 8, 2022 judgment entered on the prior order granting respondent's motion for summary judgment is affirmed.  Respondent to recover its costs on appeal.

 

 

 

 

                                                   _____

                                                 BAMATTRE-MANOUKIAN, J.

 

 

 

WE CONCUR:

 

 

 

_____

GREENWOOD, P. J.

 

 

 

_____

WILSON, J.

 

 

 

*Robinson v. Stryker Corporation*
**H050336**